**SBC COMMUNICATIONS INC., et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**AT & T Corporation, et al., Intervenors.**

Nos. 94–1637, 94–1639.

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1995.

Decided June 23, 1995.

Michael K. Kellogg, Washington, DC, argued the cause, for appellant SBC Communications Inc. With him on the briefs were James D. Ellis, San Antonio, TX, Liam S. Coonan, Dayton, OH, and Martin E. Grambow, Washington, DC.

L. Andrew Tollin, Washington, DC, argued the cause, for appellants BellSouth Corp., et al. With him on the briefs were Michael D. Sullivan, Robert G. Kirk, Craig E. Gilmore, Georgina M. Lopez–Ona, Walter H. Alford, John F. Beasley, William B. Barfield and Jim O. Llewellyn, Atlanta, GA.

John E. Ingle, Deputy Associate General Counsel, F.C.C., Washington, DC, argued the cause, for appellee. With him on the brief were William E. Kennard, General Counsel, Christopher J. Wright, Deputy General Counsel, Daniel M. Armstrong, Associate General Counsel, and Laurence N. Bourne, Counsel. John W. Berresford, Counsel, F.C.C., Washington, DC, entered an appearance.

David W. Carpenter, Chicago, IL, argued the cause, for intervenor AT & T Corp. With him on the brief were Peter D. Keisler, Washington, DC, and Mark C. Rosenblum, Basking Ridge, NJ.

Charles H. Helein and Julia A. Waysdorf, Washington, DC, were on the brief, for intervenor Ad Hoc IXCs.

Michael E. Glover, John Thorne, James R. Young, Arlington, VA and Stephen M. Tuller, Bedminster, NJ, entered appearances, for intervenor Bell Atlantic Telephone Companies.

Before: GINSBURG, SENTELLE and RANDOLPH, Circuit Judges.

GINSBURG, Circuit Judge:

SBC Communications Inc. and BellSouth Corporation appeal an order of the Federal Communications Commission approving the transfer of radio licenses and other authorizations from McCaw Cellular Communications, Inc. to AT & T Corporation in connection with the merger of those two companies. *See Craig O. McCaw and American Telephone and Telegraph Co., Memorandum Opinion and Order*, 9 F.C.C.R. 5836 (1994) (*Order*), errata, slip op. (Enf.Div. Sept. 27, 1994). The appellants make three types of claims: first, that the Commission approved the merger only because it underestimated the anti-competitive impact of the merger; second, that in order to mitigate the anti-competitive impact of the merger it should have imposed certain conditions upon the transfer of licenses; and third, that its procedures were both arbitrary and inadequate. Finding no merit in any of those claims, we affirm the order in its entirety.

## I. Background

AT & T is the leading provider of interexchange (IX) service in the United States and one of the largest manufacturers in the U.S.

market for cellular telephone network equipment, *i.e.*, cellular switches, radio transceivers, and the related network equipment and software necessary to operate a cellular carrier. In 1993 it announced a plan to merge with McCaw, the leading provider of cellular telephone service in the country; McCaw would become a subsidiary of AT & T and would transfer to AT & T control of its more than 400 radio licenses.

AT & T and McCaw applied to the Commission for approval of the license transfer under 47 U.S.C. § 310(d) ("No ... station license ... shall be transferred ... to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby"). The Commission published notice of the application and solicited comments, *see Public Notice,* 8 F.C.C.R. 7110 (1993). A number of parties including BellSouth and SBC, both of which own Bell Operating Companies that provide cellular service in competition with McCaw, filed petitions to deny the application or to impose conditions upon the grant of the application. *See Order,* ¶ 5.

Meanwhile, AT & T and McCaw had submitted to the Department of Justice extensive materials relating to the merger as required by the Hart–Scott–Rodino amendment to the Clayton Act (HSR), 15 U.S.C. § 18a. In May 1994, after the period for commenting upon the pending license transfer application had closed, the Commission staff asked AT & T and McCaw to submit the HSR materials to the FCC and to allow counsel for any party of record to review all the HSR materials pursuant to an order prohibiting the unauthorized release of confidential information. *See Protective Order,* 9 F.C.C.R. 2613 (C.C.Bur.1994). After reviewing indices identifying all HSR materials relating to certain specified subjects, however, the staff narrowed its request for HSR materials and stated that it would not expand the scope of its examination "in the absence of extraordinary circumstances and a specific factual showing that good cause exists for delaying the Commission's decision." After reviewing the HSR indices themselves, however, BellSouth and SBC filed further com-

ments suggesting, *inter alia,* that the Commission review certain additional HSR documents.

In July 1994 the DOJ simultaneously filed in the U.S. District Court for the District of Columbia a complaint charging that the merger would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, *see United States v. AT & T Corp. and McCaw Cellular Communications, Inc.,* No. 94–CV01555 (D.D.C.) and a proposed consent decree to which AT & T and McCaw had already agreed, *Proposed Final Judgment* (PFJ), 59 Fed.Reg. 44,159, 44,159–66 (1994). The district court has not yet passed upon the PFJ.

For its part, the Commission approved the license transfers in September 1994. The portion of its public interest inquiry most central to this appeal is its "consideration of the effect of the transfer on competition," *Order,* ¶ 9. The Commission analyzed the competitive impact of the merger in three markets: (1) the national market for IX services, *see id.* at ¶¶ 12–15, 21–34; (2) the local market for cellular service, *see id.* at ¶¶ 16–17, 36–41; and (3) the national market for cellular network equipment, *see id.* at ¶¶ 18–19, 42–56. It found that the merger would have significantly greater pro-competitive than anti-competitive effects, *id.* at ¶ 62, and rejected most of the many conditions that the parties challenging the merger had urged it to impose upon the transfer, *see id.* at ¶ 20. The Commission also rejected various objections to the procedures it had followed, *see id.* at ¶¶ 155–173.

 BellSouth and SBC now appeal the Order, pursuant to 47 U.S.C. § 402(b)(6). AT & T intervenes in support of the Commission, and the Ad Hoc IX Carriers (Ad Hoc IXCs), a "coalition of resellers of [IX] service," *see Order,* ¶ 152, intervene in support of the appellants. In addition to supporting the appellants' arguments, however, the Ad Hoc IXCs challenge the Commission's refusal to consider their allegations that the merger would facilitate AT & T's continuation of certain allegedly anti-competitive practices, *see Order* at ¶¶ 152–154. Because "an intervening party may join issue only on a matter that has been brought before the court by another party," *Illinois Bell Tele-*

*phone Co. v. FCC,* 911 F.2d 776, 786 (D.C.Cir.1990), we do not address the merits of that argument.

## II. ANALYSIS

■■■ We review the Commission's decision only to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). The Commission's decision that a license transfer is "in the public interest" is entitled to "substantial judicial deference." *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). So long as "the FCC's action resulted from consideration of the relevant factors" and the agency has not "succumbed to a clear error of judgment," its decision must be upheld. *GTE Service Corp. v. FCC,* 782 F.2d 263, 268 (D.C.Cir.1986).

### A. The Commission's Public Interest Analysis

BellSouth and SBC challenge different aspects of the Commission's public interest analysis, *see Order,* ¶¶ 1–61. BellSouth, supported by the Ad Hoc IXCs, contends generally that the Commission applied the wrong standard and that its public interest analysis was riddled with errors and inconsistencies. More particularly, SBC argues that the Commission should have analyzed the impact of the merger in the market for IX service available to cellular customers.

### 1. BellSouth's Appeal

BellSouth launches a diffuse attack, supported by a collection of loosely intertwined arguments, upon the Commission's public interest analysis. Here, we summarize and address first its broad claim and then each of its individual arguments.

First, BellSouth contends broadly that the Commission "manipulated the legal standards for analyzing competitive effects" by relying solely upon the antitrust laws in order to analyze the anti-competitive effects of the merger while looking beyond antitrust considerations to gauge the pro-competitive benefits. Second, and more specifically, Bell-South argues that the Commission failed to consider "special circumstances affecting competition," particularly the fact that the Modified Final Judgment (MFJ)—the consent decree setting forth the terms by which AT & T divested the BOCs—prohibits a BOC (and consequently a BOC-owned cellular carrier) from selling IX service directly to its customers, *see United States v. American Telephone & Telegraph Co.,* 552 F.Supp. 131, 227 (D.D.C.1982). Third, BellSouth contends that the Commission's decision allows AT & T to be "the only facilities based national and local end-to-end service in the country since divestiture," which it would not have done had it properly focused its competitive analysis upon the market for the "integrated provision of nationwide and end-to-end cellular and interexchange service." Fourth, and relatedly, BellSouth challenges the Commission's determination that the market for cellular service is local. Fifth, BellSouth claims that the Commission ignored the HSR documents that were submitted to it. Finally, BellSouth argues, in the alternative, that the Commission should have imposed certain conditions upon its approval of the license transfers: (1) that AT & T not oppose modifications to the MFJ that would permit the BOCs to offer IX service directly to cellular customers; (2) that McCaw be made subject to the same equal access restrictions as the MFJ imposes upon the BOCs; and (3) that McCaw be prohibited from selling IX and cellular services as a single package ("bundling").

*First.* BellSouth's broad claim is wrong as a matter of fact. The Commission considered the competitive impact of the merger based upon antitrust principles and found the pro-competitive effects vastly to outweigh the few anti-competitive effects. When the Commission looked beyond the scope of antitrust law and considered the implications of the merger for the development of the telecommunications industry, technical innovation, international competitiveness, investment in infrastructure, and customer privacy, it found nothing but pro-competitive and otherwise beneficial effects. *See, e.g., Order,* ¶ 57 (merger will lead to "broadened range of

consumer choices" because McCaw has pledged to give its customers equal access to all IX carriers); *id.* at ¶ 59 (merger will increase U.S. competitiveness in international market for telecommunications services). Nothing in the Commission's consideration of the pro-competitive and anti-competitive effects of the merger suggests that it "manipulated legal standards" and, notably, BellSouth contests none of the Commission's findings in this area. Insofar as there are any specific anti-competitive effects that BellSouth claims the Commission slighted, we address them below in the context of BellSouth's more specific arguments.

■ *Second.* BellSouth's specific argument that the Commission failed to consider the MFJ as a "special circumstance affecting competition" is also wrong as a matter of fact. The Commission considered the restrictions that the MFJ imposes upon the cellular affiliates of the BOCs and rejected BellSouth's notion that it should impose similar restrictions upon McCaw; that would serve the interests only of the BOCs rather than those of the public. In the Commission's own words, "assuming [with BellSouth] ... that the MFJ restricts competition in undesirable ways, expanding its application to the BOCs' competitors would only compound the harm". *Id.* at ¶¶ 32–35.

■ BellSouth gives us no reason to doubt the Commission's conclusion; it argues in effect that the BOCs' welfare should have been paramount in the Commission's analysis. The Commission is not at liberty, however, to subordinate the public interest to the interest of "equalizing competition among competitors." *Hawaiian Telephone Co. v. FCC*, 498 F.2d 771, 776 (D.C.Cir.1974); *see also W.U. Telephone Co. v. FCC*, 665 F.2d 1112, 1122 (D.C.Cir.1981) ("equalization of competition is not itself a sufficient basis for Commission action"). Moreover, the Commission is currently addressing in a separate rulemaking the question whether it should require all cellular carriers to provide equal access to all IX carriers. *Order,* ¶¶ 68–70; *see Equal Access and Interconnection Obligations Pertaining to Commercial Mobile Radio Services, Notice of Proposed Rulemaking,* 9 F.C.C.R. 5408 (1994).

In addition, rather than launch a collateral attack upon the MFJ by requiring AT & T not to oppose its further modification, the Commission decided to consider in a separate proceeding the impact of the MFJ upon the ability of the BOCs to compete. *See id.* at ¶¶ 32, 35. That manner of proceeding is entirely reasonable: in the matter under review, the Commission was required to determine whether the merger of AT & T and McCaw would be in the public interest, not to review the overall level of competition in the cellular industry or the impact of the MFJ upon that competition. Finally, we note that the court administering the MFJ has since reviewed the impact of the restriction of which BellSouth complains, and has determined that the BOCs may offer IX service directly to their cellular customers in some areas. *See United States v. Western Electric Co., Inc.,* No. 82–CV0192, 1995 WL 338891 (D.D.C. Apr. 28, 1995).

■ *Third.* We find no merit to BellSouth's claim that, contrary to the Commission's conclusion, the merged company will have the power to restrain competition in the same way that the Bell System had prior to divestiture. The Commission specifically rejected BellSouth's analogy between AT & T/McCaw and the predivestiture Bell System, both because there is no "bottleneck" for wireless service comparable to the local "bottleneck" for wireline service, and because the cellular industry enjoys "a degree of rivalry not present in 'wireline' exchange services." *Id.* at ¶ 39. Those conclusions are well founded.

In the wireline market there is a bottleneck because virtually every call must go through the local BOC. Prior to divestiture, the BOC's control over this bottleneck allowed it to favor one IX carrier (AT & T) over others; the integrated Bell System had the power to constrict competition in the IX market. In the cellular market, however, there are two competing providers in every area of the country. Because no cellular carrier has control over all of the calls originated in its area, there is no "mobile bottleneck" parallel to the "landline bottleneck." Although nearly every cellular long distance call must travel across a BOC's landlines in

order to reach an IX carrier's network, *see United States v. Western Electric Co., Opinion,* No. 82–CV0192, op. at 6–8 (D.D.C. Apr. 28, 1995), this "mobile bottleneck" would raise concerns about competition only if a BOC cellular carrier were integrated with an IX carrier, which the BOC might then favor. Because a non-BOC cellular carrier, such as McCaw, has no "bottleneck" control over calls, its vertical integration with an IX carrier does not present the same problem.

Moreover, the merger is not as unusual as BellSouth suggests; non-BOC cellular carriers have always resold IX service directly to their customers. Indeed, prior to the merger, McCaw itself resold IX service (purchased from AT & T) directly to its customers. The merged company will merely internalize what had been a contractual relationship, and thereby (the parties to the merger believe) make them more efficient.

Finally, we note that the Commission found that the vertical integration of McCaw's cellular service with AT & T's IX service and manufacturing would not "preclude the entry or success of competitive firms," *id.* at ¶ 38. The Commission also noted that the imminent entry of so-called personal communications services, and the further expansion of existing wireless systems such as specialized mobile radio, mean that cellular carriers will be facing greater competition in the near future. *Id.* at ¶¶ 39–41. These findings, neither of which is challenged by BellSouth, further support the Commission's conclusion that the merger will not have an anti-competitive impact.

■ *Fourth.* We reject BellSouth's challenge to the Commission's determination that the relevant market for competitive analysis is the local market for cellular service. *See Order,* ¶¶ 16–17. The Commission reasoned that because it had licensed each cellular carrier to serve a Local Service Area and awarded two licenses within each LSA, the geographic market within which cellular carriers compete is the LSA. BellSouth notes that as a result of agreements among cellular carriers in different LSAs, a cellular customer now enjoys uninterrupted service when he travels outside of his "home" LSA. That is beside the point, however. Regardless

of whether a cellular customer can have uninterrupted service when traveling beyond his home LSA, the market is local because "the purchasers cannot, as a practical matter, turn to suppliers outside their own areas." *Standard Oil v. United States,* 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949).

■ *Fifth.* BellSouth's argument that the Commission ignored the HSR documents that AT & T and McCaw submitted to it is completely without merit. The Commission stated that it reviewed the documents. *Order,* ¶ 6. The agency is not obliged to summarize in its decision the contents of all of the documents in the record before it. The Commission's failure to refer specifically to those documents or to their contents in the text of the Order is hardly surprising inasmuch as they are under seal. *See Order,* ¶ 155 n. 343 (because of *Protective Order,* arguments based upon HSR materials "summarize[d] generally"). While the Commission may have had the option of publishing portions of the *Order* under seal in order to address the HSR materials expressly, as BellSouth suggested at oral argument of this appeal and upon which we express no opinion, there is apparently no precedent for such a practice and the Commission certainly was not required to do that.

■ *Sixth.* Finally, the Commission's decision not to condition the merger as urged by BellSouth is reasonable. The conditions proposed by BellSouth, like BellSouth's arguments generally, seem to be rooted in the mistaken belief that the Commission should protect competitors at the expense of consumers. *See Hawaiian Telephone,* 498 F.2d at 776 ("relative competitive positions of . . . carriers . . . is of little relevance in determining whether the public interest test is satisfied"). We have already explained why we find no error in the Commission's refusal to impose upon McCaw the restrictions that the MFJ places upon the BOCs, and why it was reasonable for the Commission to decline to launch a collateral attack upon the MFJ.

We also find reasonable the Commission's decision that McCaw's ability to bundle IX and cellular services is in the public interest.

BellSouth's only argument against the practice is that because the MFJ prohibits it from bundling IX and cellular service, McCaw should also be so limited. Again, BellSouth would have the Commission serve that company's own narrow interest rather than the broader public interest. Moreover, as a reseller of AT & T's IX service, McCaw has always "bundled" IX and cellular service—a McCaw cellular customer automatically gets AT & T as his long distance company. Finally, we have no reason to doubt the Commission's conclusion that bundling will lead to innovative rate structures and lower prices, both of which will benefit consumers. *Order,* ¶¶ 73–78.

### 2. SBC's Appeal

■■■ SBC disputes the Commission's decision that the national market for IX service is the relevant market in which to measure the horizontal impact of the merger. SBC contends that the relevant market is instead that for IX service provided to cellular customers in "cellular service areas in which McCaw offers [IX] services." SBC argues that the Commission would have recognized the anti-competitive effect of the merger if only it had focused upon "the characteristics of consumer demand for cellular long distance"—as did the DOJ in its suit to block the merger, *see United States v. AT & T Corp., and McCaw Cellular Com. Inc., Competitive Impact Statement,* 59 Fed.Reg. 44166, 44168–169 (Aug. 26, 1994)—rather than upon the market as defined by "the characteristics of retail supply." SBC points out that as it defines the market, McCaw, in its capacity as a reseller to cellular customers of IX service purchased from AT & T, has the second largest market share after its merger partner, AT & T.

The Commission's focus upon the market for all IX service rather than the market for IX service provided to cellular customers is perfectly reasonable. We accept as true, for the sake of the argument, SBC's contention that a "small but significant and nontransitory price increase in the cost of cellular originated interexchange service ... would not cause [a] wireless customer ... to switch to a landline phone," and that "cellular long dis-

tance callers generally do not view wired telephones as a viable substitute." A market need not be defined solely by reference to consumer demand, however. The substitutability of supply is also relevant, as the Commission noted: "there is no significant difference between the interexchange facilities made available to a customer making an interexchange call from a 'wireline' telephone and the facilities made available to a customer making an interexchange call from a cellular phone." *Order,* ¶ 14.

Supply substitutability is a well-accepted consideration in market definition. *See* Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, IIA *Antitrust Law* 252 (1995) ("[A]lthough not close substitutes for each other on the demand side, two products produced interchangeably from the same production facilities are in the same market"); *id.* at 255 ("It is of little consequence that consumers have no good substitutes if *producers* can immediately respond to a firm's price increase by switching production to that firm's products") (emphasis in original); *id.* at 257 ("Of course, whatever market definition is employed, relative ease of entry by other firms should always be taken into account. The one course that would be clearly wrong would be to define the market as A alone while ignoring the ease of entry from B producers"); Richard A. Posner, *Antitrust Law: An Economic Perspective* 125–134 (1976). This principle has been endorsed by the Supreme Court, *see, e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 325 n. 42, 82 S.Ct. 1502, 1524 n. 42, 8 L.Ed.2d 510 (1962) ("cross-elasticity of production facilities may ... be an important factor in defining a product market"); and applied by this court and others, *see Rothery Storage Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 (D.C.Cir.1986) ("... the capability of other production facilities to be converted to produce a substitute product is referred to as cross-elasticity of supply. The higher [this] cross-elasticit[y], the more likely it is that similar products ... are to be counted in the relevant market"); *Calnetics Corp. v. Volkswagen of America,* 532 F.2d 674, 691 (9th Cir.1976) ("production cross-elasticity must be considered" when defining product market); *see also Department of Justice/Federal*

*Trade Commission Horizontal Merger Guidelines,* 4 Trade Reg.Rep. (CCH) ¶ 13,-104 at 20,573–4 n. 14 ("[i]f production substitution among a group of products is nearly universal among the firms selling one or more of those products . . . the Agency may use an aggregate description of those markets as a matter of convenience").

In its reply brief, SBC contends that the Commission did not really rest upon supply substitution in defining the relevant market. That is clearly wrong. The Commission based its market definition upon both its own finding that an IX carrier can readily make available to cellular customers the facilities it uses to serve wireline customers, *Order,* ¶ 14, and upon the related finding of the Attorney General of California that "arbitrage activities would defeat any attempt by AT & T/McCaw to raise cellular interexchange rates above existing levels," *Order,* ¶ 13.

SBC also argues that the Commission failed adequately to consider the possibility that McCaw could develop a national wireless IX network to compete with AT & T, and therefore failed to recognize that the merger would diminish potential competition in the IX market. The Commission did, however, consider that possibility—and dismiss it as extremely speculative in view of the tremendous capital investment that would be required in order to build a national wireless IX network and of McCaw's fragile financial status. *Order,* ¶ 30 n. 73. The Commission's treatment of that subject was reasonable; the agency's responsibility is to deal with "probabilities" not "ephemeral possibilities." *United States v. FCC,* 652 F.2d 72, at 99 (D.C.Cir.1980).

## B. Proposed Conditions

As the Commission reviewed the competitive impact of the merger, it considered whether there was any need to condition its approval of the license transfers in any way. SBC now argues that the Commission erred in refusing to adopt two of the conditions that SBC proposed in order to protect against specific anti-competitive practices by AT & T.

### 1. Use of Information Gained Through Provision of IX Service

AT & T provides IX service directly to any customer of a BOC-owned cellular carrier who selects AT & T as his IX carrier. As a result, AT & T has access to so-called customer proprietary network information (CPNI), *i.e.,* each customer's name, address, cellular telephone number, and pattern of cellular telephone usage. Before the Commission, SBC noted that this information could be used by McCaw both to monitor its cellular competitors' activities and to market its cellular service directly to their customers. SBC argued that the Commission should prohibit AT & T from disclosing CPNI to McCaw.

The Commission refused to impose that limitation because it regards AT & T/McCaw's ability to offer one-stop shopping for all of a customer's telecommunications needs as one of the benefits to the public resulting from the merger. *Order,* ¶ 83. Instead, the Commission imposed upon AT & T's use of CPNI the same restrictions that it had earlier imposed upon AT & T's use of CPNI for the marketing of enhanced services and customer premises equipment (CPE). *See id.; see also Rules Governing Telephone Companies' Use of CPNI, Public Notice,* 9 F.C.C.R. 1685 (1994). In short, unless a customer requests that AT & T not use his CPNI, the Commission left AT & T free to use that information in its marketing of McCaw's cellular service. *See Order,* ¶ 83.

SBC contends that the Commission misstated the benefit to consumers of letting AT & T use their CPNI: The typical cellular customer solicited by McCaw, unlike a typical customer for enhanced services or CPE, will be unable to bargain for a lower price from his current provider. SBC argues also that the market for cellular service, unlike the market for enhanced services, will not be spurred to grow as a result of AT & T's using CPNI for direct marketing. Thus, according to SBC, "there can be no public interest justification for allowing use of . . . CPNI to raid competitors' customers."

SBC's argument, like many of those reviewed above, seems to be not that the Commission's decision—here, its refusal to im-

pose the condition—will hurt competition or otherwise adversely affect the public interest, but instead that it will hurt SBC by increasing the sting of the competition it will face from the merged company. We agree with the Commission (and so apparently does SBC) that AT & T/McCaw's ability to market its service directly to the customers of other cellular carriers should lead to lower prices and improved service offerings designed to lure those customers away. We part company with SBC only in that we do not see why that is contrary to the public interest. Even assuming that a targeted customer is unable individually to negotiate a lower price directly with his BOC-owned cellular carrier, there is no reason to think that the BOC-owned carrier will not respond to the competitive spur by providing price and service levels, if it can, comparable to those offered by McCaw. While the number of cellular customers may not be directly increased by McCaw's marketing to the BOCs' existing cellular customers, the intensified price and service competition that follows is likely to draw more customers into the cellular market—a clear public benefit. Therefore, nothing in SBC's argument gives us reason to doubt the Commission's conclusion that the proposed condition would be contrary to the public interest.

### 2. Transfer of Information from AT & T Network Equipment Personnel to AT & T IX Service Personnel

■ In its role as a manufacturer and supplier of cellular network equipment, AT & T provides repair service and equipment upgrades to cellular carriers that use AT & T equipment. As a result, AT & T may obtain sensitive information about cellular carriers that compete with McCaw. SBC argues that the Commission erred in refusing to prohibit AT & T from using such information for the benefit of McCaw. *See Order*, ¶ 110.

First, the Commission noted that there had been no significant problem in the past with AT & T misusing information obtained by its network equipment personnel. *Id.*, ¶ 112. Standing alone, that finding might be insufficient to support the Commission's decision; in the past, after all, AT & T had little

incentive to use the information to the advantage of another cellular company, whereas its affiliation with McCaw will create such an incentive. The Commission also concluded, however, that existing market incentives and legal safeguards against the sharing of proprietary and confidential information appear to be sufficient to protect McCaw's cellular competitors from the type of conduct that SBC claims to fear. Thus, the Commission found both that AT & T's manufacturing business would not last long if potential customers are given reason to fear that AT & T will misuse their confidential information, and that the threat of legal proceedings would further deter the misuse of such information. *Id.* at ¶ 112. These are reasonable observations and they support the conclusions drawn by the FCC. If AT & T is unable to persuade purchasers of its cellular network equipment that their sensitive business information will not be shared with McCaw, then AT & T's $500 million-per-year network equipment business will not long endure. Moreover, AT & T's contracts with its network equipment customers already prohibit AT & T from using confidential information and those customers can, in the future, seek even greater restrictions upon AT & T's use of this information. *See id.* at ¶ 113.

SBC points to the Commission's decision to impose conditions designed to limit AT & T's ability to discriminate against "locked-in" purchasers of network equipment, *see id.* at ¶ 99, and suggests that it was arbitrary for the Commission not to impose similar conditions in this context. The Commission, however, reasonably found that cellular carriers generally had not contracted against the problem of discrimination, while they had contracted against the misuse of confidential business information.

Finally, we note that the Commission offered its complaint process to any cellular carrier that believes it is being victimized by any specific behavior on the part of AT & T. *Id.* at ¶ 83. We are therefore confident that the Commission stands ready, in the event that its reliance upon market forces and existing legal norms proves inadequate, to revisit the claimed need for regulatory control

over AT & T's use of its equipment customers' confidential business information.

## C. Procedural Challenges

Both BellSouth and SBC challenge the procedures that the Commission followed in this matter. SBC argues that the Commission should have granted its request that the HSR documents be released to the court that administers the MFJ. BellSouth argues both that the HSR document production process was irrational and that the Commission should have held an evidentiary hearing.

### 1. Waiver of the Protective Order

■ The four BOCs that commented jointly upon the HSR material also asked for the Commission's permission to submit those comments and 84 HSR documents, under seal, to the district court that administers the MFJ. The Commission refused to grant that limited waiver of the Protective Order, however, holding that the BOCs had failed to show "extraordinary circumstances" involving "a compelling public interest" in submitting the documents to the court. *See Order,* ¶ 167.

SBC advances no compelling reason why the Commission should have waived the Protective Order. Although SBC points out that § 3 of the Protective Order allows the Commission to disclose the information to "any person ... in the interest of justice," and argues that in denying its request the Commission deviated from this standard, there is no reason to believe that the Commission's restatement of its standard is in any way material. The MFJ court can, either on its own motion or at the request of a BOC, itself order the production of the HSR documents. Moreover, the MFJ court has now passed upon the issue to which BellSouth contends the HSR materials are relevant, *viz.,* whether a BOC should be permitted to offer IX service directly to its cellular customers.

### 2. Review of the HSR Documents

■ BellSouth argues that the Commission erred by asking AT & T and McCaw to submit to it only a portion of their voluminous HSR submissions to the DOJ. In particular, BellSouth claims that the Commis-

sion acted arbitrarily in failing to review certain documents deemed relevant by both AT & T and BellSouth.

The Commission's manner of proceeding was well within its procedural discretion in implementing the Communications Act. The HSR documents contained millions of pages; for the Commission to have sorted through all of them would have delayed a decision on the transfer indefinitely. The Commission is fully capable of determining which documents are relevant to its decision-making; for us to hold that the Commission is bound to review every document deemed relevant by the parties would be an unwarranted intrusion into the agency's ability to conduct its own business, *see Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978) ("court should ... not stray beyond the judicial province ... to impose upon the agency its own notion of which procedures are 'best' "), and would "arm interested parties with a potent instrument for delay." *U.S. v. FCC,* 652 F.2d at 91.

### 3. Need for an Evidentiary Hearing

■ BellSouth argues that the Commission erred in refusing to hold a full evidentiary hearing upon the license transfer. It contends that a hearing is necessary in order to resolve "disputed factual issues," including definition of the relevant market(s), the effect of the merger upon competition in those markets, and AT & T's purpose in pursuing the merger.

■ "The decision of whether or not hearings are necessary or desirable is a matter in which the Commission's discretion is paramount." *Gencom Inc. v. FCC,* 832 F.2d 171, 181 (D.C.Cir.1987). A party seeking to compel the Commission to hold an evidentiary hearing must: (1) file a petition to deny containing "specific allegations of fact sufficient to show that ... a grant of the application would be prima facie inconsistent with the public interest," *id.* at 180; and (2) present to the Commission "a substantial and material question of fact." *Id.* BellSouth has done neither. BellSouth's "disputed factual issues" are about just the sort of "legal

and economic conclusions concerning market structure, competitive effect, and the public interest" that "manifestly do not" require a live hearing. *U.S. v. FCC,* 652 F.2d at 89–90. The Commission here developed an extensive record; by its own later account, it held a "thorough hearing—the most extensive ever held ... about the transfer of mobile radio licenses." *FCC Response to Emergency Motion for Interim Relief,* No. 94–1639, at 10 (D.C.Cir. Oct. 6, 1994). Our reading of the record suggests that an "evidentiary hearing would less promote reasoned decisionmaking in this case than it would delay and impede" the Commission's decision. *U.S. v. FCC,* 652 F.2d at 96.

### III. CONCLUSION

The appellants do little more than complain that the merger of AT & T and McCaw will lead to greater competition in both the market for IX service and the market for cellular service. They have failed to show in any way why the merger would not be in the public interest—indeed, they have more nearly shown the opposite—or why the Commission's conclusions are in error. Therefore, the order under review is

*Affirmed.*