**COVENTRY HEALTH CARE OF KANSAS, INC., Plaintiff,**

v.

**VIA CHRISTI HEALTH SYSTEM, INC., et al., Defendants.**

No. 01–1261–JTM.

United States District Court,
D. Kansas.

Dec. 19, 2001.

Alan L. Rupe, Alisa A. Nickel, Husch & Eppenberger, LLC, Wichita, KS, Thomas McKee Dee, Husch & Eppenberger, LLC, St. Louis, MO, Anthony J. Bolognese, Bolognese & Associates, LLC, Philadelphia, PA, for Plaintiff.

Stephen E. Robinson, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, John J. D'Attomo, Thomas Campbell, Steven S. Shonder, Gardner, Carton & Douglas, Chicago, IL, Robert L. Heath, Wichita, KS, Jeffrey B. Hurt, J. Michael Kennalley, Martin & Churchill Chartered, Wichita, KS, for Defendants.

Lynn D. Preheim, Kelly S. Elsea, Morrison & Heckler L.L.P., Wichita, KS, Kelly J. Rundell, City of Wichita, Wichita, KS, Eric I. Unrein, Davis, Unrein, Hummer, McCallister, Biggs & Head, L.L.P., Topeka, KS, Gary D. MaCallister, Gary D. McCallister & Assoc., Ltd., Chicago, IL, for Movants.

## MEMORANDUM ORDER

MARTEN, District Judge.

Plaintiff Coventry Health Care of Kansas, Inc. (CHC–KS) instituted the present antitrust action against defendants Via Christi Health System, Inc., Via Christi Regional Medical Center, Inc., Preferred Health Systems, Inc., and Preferred Plus of Kansas, Inc., alleging that the defendants engaged in a scheme under which CHC–KS was underbid on a contract to provide health insurance to the employees of Raytheon Aircraft Company. CHC–KS's existing contract with Raytheon expires on December 31, 2001.

CHC–KS has raised claims of anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act by predatory pricing (Counts I and III). It also contends that the defendants' actions represent unlawful use of Via Christi's alleged monopoly powers (Counts II and IV), and that the defendants tortiously interfered with its contractual rights. The court granted defendants' Motion for Judgment on Count V immediately prior to the commencement of the hearing on the injunction.

CHC–KS seeks a preliminary injunction which would nullify award of the contract to the defendant Preferred Health Systems (PHS). It requests an order which would declare the PHS bid illegal, and seeks injunctive relief. This relief includes the award of the Raytheon contract to CHC–KS, or alternatively the rebidding of the contract.

The court conducted an evidentiary hearing commencing December 3, 2001 on plaintiff's request for injunctive relief.[1] After reviewing all of the evidence submitted, the court determines that plaintiff is not entitled to the requested relief.

## I. Findings of Fact

### A. Coventry

1. Coventry Health Care of Kansas, Inc. (CHC–KS) is a corporation organized under the laws of Kansas. CHC–KS is a wholly-owned subsidiary of Coventry Health Care, Inc. (CHC). CHC–KS is a managed health care organization, which

---

1. Prior to the hearing, plaintiff submitted a Notice of Intent, in which it stated that it would seek to establish its rights to a preliminary injunction solely with respect to its Count I claim of attempted monopolization (with inclusion of its Count III claims "to the extent they are subsumed within Count I") and its Count V claim of tortious interference with contractual relations. (Dkt. No. 111, at 1).

offers health care coverage to employees within Kansas and Missouri.

2. CHC owns and operates health plans across the United States. It owns over a dozen plans in various local markets. CHC–KS is one of these plans. CHC–KS has two "profit centers," one in the Wichita area, and one in the Kansas City area. Each profit center has its own profit and loss statement.

3. Its "flagship product" is a health maintenance organization (HMO) form of health insurance. However, it also offers a full line of health insurance, including point of service (POS) insurance, and (through an affiliate, Coventry Health & Life Insurance Company) preferred provider organization (PPO) insurance. CHC also provides management services to self-funded plans.

4. HMOs, POSs, and PPOs are forms of health care insurance which include incentives and provider networks for the control of costs. HMOs and POSs utilize the services of a primary care physician as a gatekeeper to manage member access to health care services. Members of a POS are usually given the option of self-referral to network specialists at a higher costs. Members of a PPO are not managed by a primary care physician, and are free to see any physician within the network, or, at reduced rates, physicians outside the network.

5. CHC provides a range of centralized management service to its subsidiaries. These include information services, service center services and general corporate services. The company's subsidiaries conduct their own sales and marketing, provider relations and utilization management.

6. At the end of 2000, CHC had approximately 1.4 million enrolled members. At the end of September 2001, CHC had a reported membership of 1.85 million. On December 3, 2001, CHC had a market capitalization of $1.35 billion.

7. CHC has an industry reputation for acquiring other health insurance companies around the nation, and actively seeks to maintain some competitive intelligence on acquisition opportunities. For example, in April 2001, the company's subsidiary plaintiff CHC–KS acquired the approximately 50,000–member Kaiser Foundation Health Plan of Kansas City, Inc. ·

8. CHC–KS typically provides its HMO services under one year contracts with employers. CHC–KS also offers a POS plan under which members may also go out of the network for care which is reimbursed, net of coinsurance, after the applicable calendar year deductible is met. It also offers Administrative Services Only (ASO) arrangements to self-insured employee benefit plans to provide a full range of health care options without assuming insurance risk. Finally, CHC–KS also offers products which combine HMO, PPO, and indemnity forms of insurance.

9. CHC–KS's total membership in its commercial HMO plans at the end of 2000 was 121,963. This does not include the recent acquisition of Kaiser Foundation Health Plan of Kansas City, Inc.'s membership in Kansas City of approximately 50,000 members.

10. Of those 121,963 members, 43,459 members were administered through the Wichita office.

11. CHC's total reported premium revenue for 2000 was approximately $214 million. It also reported net investment income and capital gains of $2.5 million. It reported total medical and hospital expenses during this period of $198 million. After administrative expenses of $28.3 million, CHC–KS reported a net loss during the year of $1.75 million.

12. On average, out of each premium dollar received by CHC, 85 cents is paid to

providers, 12 cents is applied to operating costs, and 3 cents is profit.

13. Each local company within CHC contributes a $9.25 per member per month fee to CHC, denominated as payment of operating services provided by the national company.

14. CHC–KS currently has a contract with Wesley Medical Care Center in Wichita for the provision of hospital services to CHC–KS members.

15. The administrator of CHC–KS is Janet Marie Stallmeyer. Stallmeyer's business office is at CHC–KS's Kansas City office. Robert D. Finuf II is the Executive Director of CHC–KS. His office is at CHC–KS's Wichita office.

16. CHC's Chief Executive Officer (Alan Wise) and Chief Financial Officer (Dale Wolf) hold a quarterly phone conference with investors.

17. In addition, they frequently answer calls from financial analysts for major investment firms.

18. One of the benchmarks for comparing the financial performance of managed care companies is the medical loss ratio, which is the percent of total premium revenue that is spent to purchase medical services for members.

19. A decrease in a company's medical loss ratio is viewed as a sign of improved financial performance.

20. Wise has sought to improve CHC's financial performance and, specifically, its medical loss ratio, by instilling "strict pricing discipline" into the Company.

21. Wise believes that two important management disciplines he has brought to CHC are strict pricing discipline and actuarial management.

22. Wise defines strict pricing as "policies and the people and the processes in place to price to your costs, not to the competition, and the actuarial science which is to

be able to predict through interpretation of past data what your costs are going to be is one of the disciplines it takes to operate a health plan successfully." For the year 2000, CHC reported on the improvement of its financial performance in 1999 over 1998 as follows: "Coventry's medical loss ratio decreased slightly to 86.1% from 86.9% in 1998 due to premium increases, which are the result of Coventry's efforts to maintain a strict pricing discipline." CHC also stated: "Despite the increase in expense, the medical loss ratio, excluding charges, decreased to 85.8% from 86.1% in 1999 due to medical expenses increasing at a lessor [sic] pace than that of premium rates."

23. In its most recent annual report, CHC–KS has reported a high medical loss ratio.

24. For the year ended December 31, 2000, as shown in the report filed with the Kansas Insurance Department, CHC–KS earned premium revenue of $213,777,375 and had medical expenses of $198,702,191. This reflects a medical loss ratio of 92.9%.

25. CHC stated that its policy for the first quarter of 2001 would be to increase premium rates 12.5% for renewals.

26. CHC also stated a willingness to forego membership in the event that it was unsuccessful in its attempt to obtain premium increases: "Membership also decreased in other markets due to Coventry's efforts to adhere to a strict pricing discipline."

27. Wise prefers competing against established managed care companies because they are "prudent competitors," unlike market start-ups that "underprice a business that have cause[d] market chaos."

28. The strict pricing discipline policy established by Mr. Wise has meant that CHC has asked employers to accept price increases upon renewal. The success of

this policy is reflected by the February 6, 2001 quarterly report where CHC stated that it "achieved commercial rate increases of 15% on fourth quarter renewals."

29. To adhere to its strict pricing discipline, CHC has been willing to lose accounts where its price increases are not accepted.

30. Adherence to strict pricing disciplines is the most common cause of losing accounts at CHC.

## B. Via Christi

31. Via Christi Health System, Inc. (VCHS) is a not-for-profit healthcare organization with its principal place of business located in Wichita, Kansas. The company came into existence following the merger of two of Wichita's hospitals (St. Francis Ministry Corporation and CSJ Health System, Inc. (St.Joseph)) in October, 1995.

32. VCHS is the parent corporation of an integrated delivery system, which is a religiously sponsored, mission driven organization located in Wichita, Kansas. VCHS encompasses acute care hospitals, senior care facilities, and other affiliated businesses. It is the sole member of Via Christi Regional Medical Center (Via Christi) also a Catholic not-for-profit corporation.

33. Via Christi provides general acute care hospital services on four campuses in the City of Wichita: the St. Joseph campus at 3600 East Harry, the St. Francis campus at 929 North St. Francis, the Good Shepherd campus at 8901 East Orme and Riverside Health System, 2622 West Central Ave., Wichita.

34. Via Christi is licensed for over 1,500 beds, but staffs only approximately 800 medical-surgical beds.

35. Via Christi has 860 physicians on its medical staff. The majority of those physicians are also credentialed and serve on the medical staffs of competing hospitals.

## C. Preferred Health Systems

36. Defendant Preferred Health System (PHS), a Kansas corporation and wholly-owned subsidiary of Via Christi, is governed by a fifteen member board. The board includes seven physicians, four consumer representatives, and four hospital representatives. Of the latter, three members are Via Christi officers, and one is an officer of a separate hospital with no ties to Via Christi. The community representatives include a banker, a broker, and two attorneys.

37. Through its subsidiaries, PHS provides HMO, POS, and PPO insurance. It offers either single options, or, if the employer prefers, multiple options.

38. PHS was started by St. Francis Hospital in the 1980s. It was created when Blue Cross, which historically dealt with St. Francis and St. Joseph Hospitals, began to contract with Wesley Medical Center exclusively.

39. PHS first offered securities in 1994. The company was initially jointly owned by Via Christi and a group of Wichita physicians. The value in the PHS shares appreciated, and in 1999 the physician group sold its shares in order to realize gains.

40. PHS contracts with providers through Kansas Health Plan, Inc. (KHP). The contracts KHP has with providers are self-perpetuating.

41. PHS makes contributions to the Wichita community in order to maintain visibility, and seeks to become involved in educational programs. It provides monetary contributions to local charities, and encourages employees to participate in community activities.

42. PHS competes with all insurance companies licensed to do business in Kansas.

43. Defendant Preferred Plus of Kansas, Inc. (PPK), a wholly-owned subsidiary of PHS, is a licensed Kansas HMO. Its service area consists of 17 counties in south central Kansas, and other counties in northeast Kansas.

44. PPK has offered Wesley a contract as a contracting provider on the same terms as those offered to Via Christi. Wesley has elected not to contract with PPK.

45. PHS has approached Wesley with proposed contracts, and entered into a limited services agreement with Wesley.

46. Wesley terminated the limited services agreement in February 2001. PHS unsuccessfully attempted to dissuade Wesley from terminating the agreement.

47. PHS is not always successful in bidding for employer business. It recently attempted to bid for business from Wichita Eagle, but the contract was given to United Healthcare for its indemnity market.

48. Preferred Health Care, Inc. (PHC) offers a PPO product on a state-wide basis.

49. Insurers who direct substantially more volume to providers can negotiate a volume discount from the providers.

50. In some cases employers are willing to offer dual options of various networks and various insurers to allow their employees a choice when the financial impact is beneficial to the employers.

51. PHS can offer lower rates if it is in an exclusive situation.

### D. The Raytheon Contract

52. CHC–KS acquired the contract with Raytheon by purchasing the HMO business of Principal Mutual Life Insurance (Principal). The acquisition of Principal created CHC's plans in Kansas City and Wichita.

53. CHC–KS, through its predecessor Principal, has served as health plan provider to Raytheon since January 1, 1997. The initial contract had a three-year term.

This contract was subsequently renewed twice, and CHC–KS has provided or will provide health plan services to Raytheon for the years 2000 and 2001.

54. The current CHC–KS contract with Raytheon expires December 31, 2001.

55. The Raytheon business has never been profitable for CHC–KS. In 1997, the contract lost $6 million. In 1998, the contract lost $5 million. In each of the next two years, CHC–KS lost $3.5 million on the contract. In its last year, CHC–KS will lose approximately $4 million on the contract.

56. In total, CHC–KS has lost about $22 million on the Raytheon contract.

57. In late 2000, Wesley notified CHC–KS that it intended to raise its rates and change from a capacitated rate schedule to a fee-for-service arrangement for the Raytheon members.

58. CHC–KS believed Wesley's rate was too high. CHC CEO Alan Wise met with Wesley executives to talk about the upcoming negotiations with Raytheon. This meeting was not successful, and Wise instructed Finuf to seek a provider agreement with Via Christi.

59. CHC–KS and Via Christi managers met to discuss a potential contract.

60. Contrary to suggestions made by CHC–KS, Via Christi did not insist on any exclusivity provisions in the proposed contract.

61. CHC–KS proposed to Via Christi that it would agree to impose rates within 5% of its rates charged to all its other contractors, a provision targeted at PHS. Via Christi would not agree to such a condition.

62. Via Christi made a counter offer to CHC–KS based upon per diem reimbursement at a specified discount from covered charges. Via Christi never deviated from

this offer, and would in fact have agreed to a contract based upon these figures if CHC–KS had responded to its offer.

63. CHC–KS's proposal for a contract to Via Christi approached, but never met, Via Christi's requirements.

64. Via Christi had reason for concern that Raytheon and/or CHC–KS was sincere in contracting with Via Christi, and that they were simply looking for information which they could use to leverage a better deal from Wesley.

65. Via Christi never told PHS of its negotiations with CHC–KS.

66. Via Christi's rates for Raytheon members are similar to rates paid to others, including the City of Wichita's Preferred Plus of Kansas rate.

67. In or about April 2001, CHC–KS and Raytheon began negotiations for the renewal of the health plan agreement.

68. CHC–KS knew that Raytheon required at least a three-year contract. Raytheon's desire for a three-year contract arose because of its negotiations with its labor union.

69. CHC–KS's first bid for the Raytheon contract included a 3% profit margin. It also increased the price of its bid because of an anticipated 27% health cost increase. Around one third of this increase was due to Wesley's announcement of higher rates.

70. Raytheon and PHS also entered into discussions relating to a proposed contract. These discussions were initiated by Raytheon.

71. PHS did not know of the earlier discussions between CHC–KS and Via Christi during meetings with Raytheon officials regarding the proposed contract.

72. A renewal meeting was set for May 1, 2001. At this renewal meeting, CHC formally requested a rate increase of approximately 31% over the prior year's premium.

73. Due to the anticipated size of the CHC–KS rate increase, in April 2001, Raytheon invited Via Christi to submit a quote with two-tiered fully insured rates with second and third year guarantees.

74. Raytheon also invited a bid for its health insurance account from Blue Cross. Blue Cross subsequently bid for the Raytheon account by submitting a bid for its PPO insurance.

75. CHC–KS's second bid was zero profit. Combined with a further 2% reduction in rates offered by Wesley, CHC–KS offered a second proposal for the 2002 contract to Raytheon, representing a 27.2 percent increase over the existing contract. The contract included a 12.8 percent rate cap on a second year. The proposed contract did not include coverage for a third year.

76. In April 2001, Raytheon solicited a proposal from PHS for the provision of health care coverage to Raytheon employees commencing January 1, 2002.

77. On or about April 18, 2001, representatives of Raytheon, Hewitt (Raytheon's consulting firm), and PHS met to discuss a potential contract.

78. On April 27, 2001, PHS submitted its primary rate response to Hewitt relative to a potential contract under which PHS would provide health insurance to Raytheon employees commencing January 1, 2002.

79. On June 26, 2001, PHS submitted to Hewitt its "Summary of Benefits" regarding its proposal.

80. Around July 3, 2001, PHS submitted its response to Raytheon's Request For Information, supplying various information related to a potential contract.

81. Around July 26, 2001, Raytheon and PHS entered into a letter agreement docu-

menting the terms of the PHS contract proposal to Raytheon.

82. On August 5, 2001, Raytheon awarded the contract to PHS.

83. PHS's winning bid for the contract commencing in 2002 was approximately 12% above the level of the existing 2001 CHC–KS contract.

84. The PHS bid would represent savings to Raytheon of approximately $31 million compared to the bid by CHC–KS.

85. CHC would not allow CHC–KS to provide Raytheon a bid for the requested three-year time period. Instead CHC offered only a two year deal.

86. Alan Wise's testimony that the "overwhelming" number of health plan contracts are for a single year and that multi-year health plan contracts are "very uncommon and rare" is not credible.

87. Not only was the initial Principal/Raytheon agreement a three-year contract, but a representative of Hewitt, the health plan benefit consultant hired by Raytheon for this matter, testified that his clients and others have entered into multi-year health plan agreements.

88. PHS met with Raytheon union representatives during the contract negotiations, and identification of the payor has been specifically incorporated into the Raytheon—union collective bargaining agreement. Alteration of the challenged PHS–Raytheon contract would require modification of the collective bargaining agreement.

### E. Health Plan Competition

89. CHC–KS alleges in its complaint that PPOs and indemnity plans are not reasonable substitutes for HMO and HMO–POS products, and that PHS accounts for a dominant share of HMO/POS enrollment and a significant share of all managed care lives.

90. These contentions are not factually credible.

91. HMO–POS insurance and PPO-type insurance do compete. In testimony before the court, CHC–KS Executive Director Robert Finuf agreed that each of these forms of insurance are "out there for people to choose and they do compete."

92. CHC publicly reports that its offerings compete across a range of health insurance formulations, stating:

> "The Company's commercial health plans are marketed primarily to employer groups as alternatives to conventional fee-for-service health care and indemnity health insurance programs."

> "The Company's health plans operate in highly competitive environments and compete with other HMOs, PPOs, indemnity insurance carriers and physician-hospital organizations."

> "Premiums for such commercial PPO and POS products are typically lower than HMO premiums due to medical underwriting and higher deductibles and copayments that are required from the PPO and POS members."

93. Internal documents of CHC–KS show that the company specifically considers companies which offer PPO insurance as competitors.

94. In a number of instances, CHC's HMO products have been replaced by, or face ongoing competition from, PPOs, POSs and other forms of health care financing. CHC has noted in its public reports the loss of "a large group from a commercial risk product to a self-funded product."

95. Finuf has had experience designing and marketing a product that priced CHC–KS's HMO, POS and PPO plans the same.

96. Finuf's testimony is not credible because of inconsistencies between his affida-

vit and other testimony at the present hearing, including his own. For example, although CHC repeatedly suggests that Blue Cross is not an effective competitor in the Wichita market, Finuf acknowledged at the hearing that in 1998 Blue Cross "[c]ertainly as entity Blue Cross was and remains a competitor, sure."

97. Although averring in his affidavit that PPOs are generally more expensive than HMOs, Finuf reported in a 1997 CHC report that "We remain less than competitive in the small group (<50) market with rates 10% above the PPOs."

98. In the same memorandum, Finuf included a discussion of "major competitors in the Wichita Market," stating: "The Blues have not had much growth in their HMO product but remain viable in their PPO and POS offerings. They are generally competitive in their pricing and have a good reputation for service."

99. CHC's ability to compete was limited by its higher prices. An internal marketing report for 2000 noted that "Coventry products simply cost more than comparable benefits from other competitors. Blue Cross Blue Shield of Kansas pricing is separated out to highlight the fact that they appear to be offering lower than market average prices."

100. CHC–KS has designed a product that it called "Health Solutions" that provided an employer with three choices for its employees, an HMO, a POS, and a PPO. The product was designed so that the premium cost to the employer, on a per member per month basis, was the same irrespective of which product variant was selected by the employee.

101. In its 2000 Marketing and Sales Plan, CHC–KS stated that interest in the Health Solutions product "has been great." While expressing disappointment with slower sales than anticipated, CHC–KS planned to increase its telemarketing of Health Solutions.

102. Health Solutions was a product CHC–KS had offered to customers in Wichita in the past and continued to do so.

103. CHC is aware of situations where it has bid for business with a quote on its HMO product, but lost to PPOs, POS plans or self-insured products.

104. The suggestion that PPO plans do not compete with HMO and POS plans and other product variants is also belied by the actual conduct of employers in the marketplace. Employers in Wichita have switched from a PPO to an HMO or vice versa.

105. When asking for bids, employers often receive competing offers from managed care companies where one offers an HMO and the other offers PPO.

106. CHC has observed that there are two steps to the sale of a health plan: the first is the sale to the employer. The second is the sale to individual employees who decide which plan to enroll in.

107. In a number of instances, an employer has offered its employees the option of an HMO or a PPO, either from the same managed care company or from two different companies ("dual option" plans).

108. Several major employers in Wichita presently offer dual options to their employees where one option is an HMO product with one carrier and the other a PPO product by another.

109. Boeing, one of the largest employers in Wichita, under its present contractual arrangements, gives its employees the option of enrolling in a POS that is a self-insured product, managed by PPK, or one of two products offered by Blue Cross Blue Shield, either a POS or an HMO.

110. Other Wichita employers that offer their employees a dual option include Cessna, which presently has a PPO man-

aged by Blue Cross Blue Shield and other options from Mutual of Omaha and Aetna.

111. Among larger managed care providers in Sedgwick County, Blue Cross and Blue Shield has 84,914 members, PPK has 63,346, and CHC–KS has 54,015.

112. CHC–KS publicly reports via its web site that its Wichita division has 85,000 members.

113. In August 2000, Finuf met with Randy Nyp and LeRoy Rheault of Via Christi.

114. During this meeting, Finuf inquired whether Via Christi would consider selling PHS to CHC–KS.

115. Rheault told Finuf that Via Christi had no interest in selling PHS to CHC–KS.

116. CHC has a full time Mergers and Acquisitions area, headed up by Drew Asher.

117. According to CHC's CEO, buying PHS had "definitely" hit Asher's radar screen.

118. Wise recalled discussing the proposed acquisition of PHS briefly with Finuf.

119. CHC regularly looks for health plans to purchase.

120. CHC has, in the past, sought to acquire health plans in its existing market places as a way to grow its existing plan and improve the combined plans' financial performance.

121. CHC has purchased distressed plans, plans that are losing money, because it can buy them cheaply.

122. Investment analysts have characterized CHC's strategy as betting its future on buying weak health plans and rehabilitating them

123. A recent example of CHC's acquisition activities is the September 1, 2001 acquisition of Qualchoice Health Plan in Virginia. The acquisition added 110,000 members to CHC's Virginia plan.

## F. Hospital Competition

124. The chief competition for Via Christi is Wesley, a flagship facility in the HCA (formerly Columbia/HCA) for-profit hospital chain. Wesley is very competitive in the market and has an operating margin of approximately 6.45%. Via Christi Regional Medical Center's operating margin has been between 1 and 2%.

125. Via Christi also faces stiff competition from other nearby hospital facilities. In particular, specialty hospitals have recently entered the market, providing competition for the most profitable services. Kansas Heart Hospital, an inpatient cardiac surgery hospital was opened by 27 physicians who practiced at Via Christi. In its first year of operation, Via Christi lost over $25 million of revenue to the Kansas Heart Hospital. A second cardiac hospital is scheduled to open later this month.

126. Via Christi also recently lost its contract to provide cardiac services from the VA Medical Center to the Kansas University Medical Center.

127. Via Christi has also been forced to respond to strong competition by Wesley in the provision of Obstetrical and Gynecological services. Wesley's OB/GYN services accounts for approximately 60% of the infants delivered in Sedgwick County. In an attempt to better compete in the profitable service line, Via Christi Regional Medical Center has recently upgraded its birthing unit.

128. Via Christi also faces competition from Cypress Surgery Center, which provides OB/GYN services, and the Wichita Specialty Hospital.

129. Via Christi has lost a substantial volume of business for outpatient services to other health care facilities in the area.

130. Via Christi has recently lost two significant contracts which together are comparable in size to that of Raytheon. Via

Christi recently lost its contract for hospital services with Cigna, representing 16,000 covered lives, to Wesley. It also lost a First Health contract representing around 6000 covered lives.

131. Not counting the recent-entrant specialty hospitals, Via Christi has 59% of patient admissions and 57% of patient revenues in Sedgwick County. Wesley has 41% of patient admissions and 43% of patient revenues.

132. A portion of Via Christi's higher market share is attributable to its offering services (including burn treatment, non-Medicare inpatient psychiatric treatment, AIDS treatment and inpatient dialysis services) which are not offered by Wesley, and which provide no profits to Via Christi. These services are offered as a part of Via Christi's underlying mission. Via Christi undertook to keep the unprofitable Good Shepherd inpatient psychiatric treatment facility open specifically because this was the only facility providing these services in Wichita.

133. Between 50 and 52% of Via Christi's inpatient admissions are covered by Medicare or Medicaid.

134. There is no credible evidence that Via Christi has market power in the Wichita market, defined as the ability to raise prices above competitive levels without an adverse impact on profits.

135. In addition to changes to hospital admitting patterns caused by shifts in employer contracts between different managed care products, patients are often shifted between Wesley and Via Christi Regional Medical Center. For example while the Raytheon patient base of approximately 25,000 will be shifted to PHS providers like Via Christi Regional Medical Center, the recent entry by CIGNA and First Health's recent entry into exclusive provider agreements with Wesley will move their combined 22,000 members away from Via Christi Regional Medical Center.

136. As Randy Nyp, CEO of Via Christi, testified in regard to shifts of patients in managed care plans, "That is normally how it goes."

137. CHC–KS's principal supplier of inpatient hospital services in Sedgwick County is Wesley Medical Center. For its Wichita HMO plan, CHC–KS also has provider agreements with hospitals within a 90–mile radius outside Sedgwick County to serve the members of its health plans who live and work in those areas.

138. Wesley provides its hospital services to CHC–KS at discounted rates. The discount on rates for services to Raytheon employees covered by CHC–KS is greater than discount on the rates for non-Raytheon employees.

139. PPK's principal supplier of inpatient hospital services in Sedgwick County is Via Christi. PPK also has provider agreements with hospitals outside of Sedgwick County to provide inpatient hospital and other services to the members of its health plans.

140. PPK's provider agreement with Via Christi RMC contains a Diagnostic Related Group-based fee schedule with a one-year duration. This DRG-based schedule itself provides incentives to reduce the cost of inpatient hospital costs by providing a single payment for a single diagnosis. As Via Christi reduces the length of stay for PPK patients, it can decrease costs and increase margin.

141. In addition, certain PPK/Via Christi provider agreements provide additional incentives to control hospital costs through the use of a 10% withhold arrangement. Under this arrangement, 10% of hospital charges are withheld subject to release should Via Christi meet certain mutually agreed upon utilization targets.

142. About 85% of providers in the CHC–KS provider network are also in the networks of Blue Cross and/or PHS.

143. CHC–KS typically pays a higher percentage of its premium revenue to physicians than PHS.

## G. DRG–Based Rates

144. Decisions on payment for hospital costs are historically made by the payor after the care has been rendered.

145. However, a problem arises for the hospital when a physician has not documented the need for the care or a longer length of stay. In the first case, the hospital may not be paid at all, and in the second case the hospital will not be paid for the less intensive post-procedure period.

146. Typically, payors reimburse hospitals on a per diem rate. Under this arrangement the hospital is compensated a set amount for each day a patient is hospitalized.

147. Per diem arrangements normally provide that managed care payor have stringent review utilization control. This control is designed to ensure that medical care is appropriate and in the hospital setting this means controlling the length of stay. Physicians, not hospitals control the admission and discharge process.

148. A hospital usually incurs higher costs in the first few days of hospitalization when diagnostic tests and/or surgical procedures are generally performed. After those tests and/or procedures are done, the hospital's costs are lower.

149. The per diem rate is calculated to take into account this differential in costs.

150. A per diem arrangement usually includes a "stoploss" mechanism which reduces the per diem payment amount after a certain time.

151. A consequence of per diem arrangements is that hospitals are frequently left uncompensated if the payor determines that treatment, or length of treatment, was not needed. In such situations, the payors will pay the physician prescribing the hospitalization, in order to avoid potential litigation, but will not compensate the hospital for its costs.

152. To address this problem, Via Christi has developed a Diagnostic Related Groups (DRG) payment schedule for managed care contracts with PPK to control costs, increase efficiency, lower charges and pass savings on to consumers.

153. PHS moved to reimbursement on the basis of DRG rates for 2001. As of 2001, all hospitals which PHS dealt with in the HMO program switched to a DRG reimbursement method.

154. Under the DRG schedule, the hospital is paid a set fee from each patient based on diagnosis. The schedule uses the federal Medicare DRG classifications but the rates have been adjusted to more accurately reflect the age of the managed care patient population.

155. Experience with DRG-based fee schedules has shown that it has allowed the hospital to improve efficiency. It improves surgical scheduling, allows faster access to physical rehabilitation, and provides faster chest pain evaluation procedure. This helps reduce the length of stay and therefore lowers hospital costs. By allowing the hospital to control its costs better, the system increases profitability while lowering hospital rates to the third-party payors.

156. Via Christi has also added "hospitalists" to its staff to attend to PHS patients while their primary physicians are unavailable. A hospitalist is a licensed physician present at the hospital who is directly involved in patient treatment and whose purpose is to accelerate effective treatment. For instance, the hospitalist can

evaluate test results and begin a course of treatment immediately rather than wait until the admitting physician is available.

157. PHS pays less to physician providers in the Wichita market than its competitors.

## H. Other Market Participants

158. Blue Cross is the largest health insurer in the State of Kansas. It has approximately 715,000 members enrolled in its various health plans in the State of Kansas.

159. Blue Cross has operated in the State of Kansas for the last 60 years. Blue Cross is based in Topeka, Kansas and employs approximately 2,100 people.

160. Blue Cross maintains a Wichita office with approximately 25 employees. It also has offices in Salina, Hutchinson, Pittsburgh, Garden City, Dodge City, Hays, Manhattan, and Lawrence.

161. Blue Cross's Wichita office serves a geographic area consisting of approximately 11–12 counties.

162. Blue Cross offers several benefit plans, including Premier Blue (an HMO); Blue Select (POS) and Blue Choice (PPO).

163. Blue Cross has one of the most recognized brand names in the United States.

164. The "Blue Cross" brand name gives Blue Cross a competitive advantage in terms of marketing. In addition, Blue Cross's large member base gives it a competitive advantage with respect to contracting.

165. Blue Cross contracts with approximately 98% of health care providers in Kansas. As a result, there is substantial overlap with respect to physicians contracting with Blue Cross and physicians contracting with PHS and Coventry.

166. The Board of Blue Cross has approved a transaction whereby Blue Cross will be acquired by Anthem Blue Cross/ Blue Shield. Anthem Blue Cross is one of the largest health benefit companies in the nation. Blue Cross expects that its affiliation with Anthem will further strengthen its business in Kansas.

167. In Sedgwick County alone, Blue Cross has about 60,000 covered lives in managed care programs. Blue Cross has 10,323 members in its HMO plan, 41,512 members in its PPO plan, and 8,063 members in its POS plan.

168. Current clients of Blue Cross in the Wichita market include Cessna, Boeing, Sedgwick County, and the State of Kansas.

169. Across the State of Kansas, Blue Cross has 43,952 members in its HMO plan, 204,389 members in its PPO benefit plan, and 109,347 members in its POS benefit plan.

170. Blue Cross is always looking for ways to grow its business.

171. Blue Cross considers the health insurance business to be competitive.

172. Blue Cross perceives that migration between and among HMO benefit plans, POS benefit plans, and PPO benefit plans is "happening a great deal right now" in both the Wichita market and across Kansas.

173. Aetna, Mutual of Omaha, American Medical Securities, Coventry, PHS, and Blue Cross are all competing managed care companies in the Wichita market.

174. Blue Cross believes that HMO, POS and PPO benefit plan proposals are commonly presented to employers in a single proposal.

175. Blue Cross, PHS, Aetna, and Mutual of Omaha each offered a PPO benefit plan to Cessna employees in Wichita.

176. As early as February 2001, Blue Cross specifically sought to bid on the Raytheon contract, even before Hewitt solicited proposals from PHS and Blue Cross.

177. Raytheon requested a bid from Blue Cross for an HMO, POS, and PPO benefit plan.

178. Blue Cross unsuccessfully bid on the Raytheon contract. It does not believe that the loss of the Raytheon contract has affected its competitiveness "one way or the other."

179. Blue Cross proposed to service the Raytheon account from its Topeka office and believes that it would be feasible to manage the Raytheon account from its Topeka office.

180. A managed care company could manage the Raytheon account with only a few representatives in Wichita.

181. Blue Cross will be unaffected and remain a viable competitor in the Wichita market when PHS takes over the Raytheon account on January 1, 2002.

182. With respect to inpatient hospital services rendered to members covered under its HMO benefit plan and its PPO benefit plan, Blue Cross also receives a substantial discount from billed charges.

183. Andrew Corbin, Vice–President of Marketing for Blue Cross views the present lawsuit as "sour grapes," and believes that the managed care business is "a competitive business," and that disappointed bidders often simply assume that the successful bidder was engaging in predatory pricing.

184. Blue Cross believes that a POS benefit plan can be designed to have benefits "identical" to a PPO benefit plan.

185. The method of accessing benefits is the principal distinction between a POS benefit plan with benefits comparable to a PPO benefit plan.

186. The City of Wichita finances health care insurance for approximately 8000 employees and dependents.

187. The City contracted for health insurance with Blue Cross Blue Shield until 2000, when it transferred its business to PHS. The contract has a provision under which the City and PHS equally share any profits in excess of 4 percent.

## I. Intent to Monopolize

188. CHC–KS has failed to present credible evidence of an intent by defendants to monopolize any relevant market.

189. Minutes of a February 12, 2000 PHS Executive Committee Planning Meeting reports that "[t]here was much concern over the ability of PHS to compete if the health plan market in Wichita becomes solely price driven." These concerns are repeated in minutes for a Preferred Health Care, Inc. meeting two weeks later, with the addition: "We do not have the reserves to compete head to head with a large insurer."

190. These documents in fact show that the portrait of PHS as an effective predator—able to absorb high losses during the initial phase predation—are not credible.

191. Via Christi does not tell PHS how to conduct business or control its operations. PHS is managed solely by its officers and directors.

192. All contemporaneous internal documents of PHS consistently show that its proposed pricing for the Raytheon contract covers anticipated variable costs.

193. During 2001, Via Christi remained willing to contract with CHC–KS.

## J. Managed Care Pricing

194. Both Coventry's and PHS's rates to employers for managed care services are set through the use of actuarial services and business judgment.

195. CHC employees a standard pricing approach based on three factors: (1) an analysis of the claim experience of the account, (2) the company's administrative costs, and (3) a profit component.

196. The administrative component includes expenses at the local plan level, plus centrally managed costs. The profit component is a 5% pretax margin on the revenue for the local plan entity.

197. Under CHC's pricing approach, the claim experience of large customers is used as the exclusive predictor of future medical costs, where that experience meets certain criteria developed by CHC's actuaries and codified in its underwriting guidelines.

198. Finuf testified that when comparing PHS's and CHC–KS's bids the only component where there could be any significant difference would be in the hospital pricing.

199. Over the last two years, PHS's physician provider costs have been significantly lower than CHC–KS's physician provider costs.

200. If CHC–KS's provider payments were reduced by 30%, its Raytheon bid could have been lowered by approximately $20 per member per month (pmpm).

### K. Relevant Product Market

201. Plaintiff has failed to carry its burden of proving a relevant market in this case.

202. In support of its motion, Coventry Health System–Kansas proffered the testimony of Professor Roger Feldman.

203. Feldman did not offer an opinion that Via Christi Regional Medical Center has monopoly power.

204. Feldman also testified that "my opinion on the hospital market is actually different than a geographically defined market for an antitrust case."

205. Feldman did not render an opinion of whether the PHS bid is predatory.

206. Feldman did not evaluate the number of or the prices charged by PPOs in the market.

207. Feldman did not determine whether HMOs constrained the price of PPOs.

208. The methodology Professor Feldman used to define a geographic market for hospital services relies solely on patient discharge data.

209. Feldman's opinion that HMOs are a separate product is not credible. His opinion is based upon measuring a correlation between HMO market entry and in HMO prices. Feldman made no attempt to simultaneously measure effect on prices for PPOs in these markets.

210. In addition, Feldman agrees that assessment of a product as separate and relevant may be confirmed by surveying market participants. However, Feldman made no attempt to conduct such a survey in the present case.

211. Evidence in the present case establishes that employers and employees frequently consider HMOs, POSs, and PPOs to be alternative forms of the same product—health insurance—rather than separate products.

### L. Alleged Below–Cost Pricing

212. Via Christi employs a computerized accounting system, HBO–Trendstar, to track its revenues and costs. The HBO–Trendstar system is an off-the-shelf, widely used accounting software system.

213. The accounting system employed by Via Christi is a well-developed system which utilizes standard definitions and applies common cost accounting procedures. The system is both sound and comprehensive. It is also in the mainstream of automated accounting systems.

214. Cost accounting is used by businesses as a decision-making tool. It assists businesses in assessing their fixed and variable costs.

215. Plaintiff CHC–KS's expert witnesses Roger Feldman and George Saitta failed

to present proof that Via Christi's price to PPK is below cost.

216. Feldman has never previously written about predatory pricing, and has never previously testified as an expert on the question.

217. Feldman's analysis is based on Via Christi's Medicare Cost Report, which is not a document prepared for cost accounting purposes. Feldman failed to use Via Christi's cost accounting records which were available, and which form a more credible basis for assessing Via Christi's variable costs.

218. Feldman selectively followed the criteria for analyzing predatory pricing described by Professors Areeda and Turner, rejecting the criteria that did not support his conclusions.

219. Feldman included in his calculation of Via Christi's fixed costs only those costs associated with its total book value of land, land improvements, moveable equipment and construction, less depreciation, property taxes, and the cost of property insurance.

220. Feldman makes no allowances for any managerial or labor costs as fixed. He concedes this is a departure from the view recommended by Areeda & Turner, which Feldman follows in other respects in his analysis.

221. The effect of Feldman's approach is to characterize approximately 90% of Via Christi's costs as variable.

222. Generally, 70% of a hospital's costs are viewed as fixed costs.

223. Feldman did not attempt to confirm his high assessment of variable costs by directly surveying individuals with knowledge of Via Christi's costs.

224. Feldman directed Mr. Saitta to rely on Via Christi's Medicare cost reports in making his analysis and did not directly analyze the hospital's accounting reports. He did not ask Mr. Saitta to make any analysis based on Via Christi's consolidated financial statements.

225. There is no accepted accounting principle that covers the methodology used by Mr. Saitta to calculate Via Christi's costs.

226. Feldman did not follow Areeda and Turner in defining variable costs.

227. Feldman's erroneous definition of variable costs includes executive salaries, which he believes vary with output.

228. Feldman did not test his trend calculations against a third source until the day he testified in this court.

229. Feldman's definition of fixed and variable costs is not a recognized accounting definition.

230. The largest single cost for Via Christi Regional Medical Center is labor.

231. Mr. Saitta was instructed to categorize all labor costs as completely variable.

232. To categorize all labor costs as variable costs would mean that all employees at Via Christi Regional Medical Center work on a commission basis based on patient census.

233. Saitta has never previously applied the Feldman definition of variable/fixed costs to a Medicare Cost Report. He is unaware of any other accountant who has ever applied the Feldman definition of variable/fixed costs to a Medicare Cost Report.

234. The application of the Feldman definition of variable/fixed costs to a Medicare Cost Report is not supported by any literature.

235. Saitta did not test any of his opinions.

236. In addition, the variable cost analysis of Professor Feldman is not a reliable, credible, or appropriate measure of the incremental cost to PHS of the new Ray-

theon members, since this analysis is predicated on Via Christi's existing average variable costs for all patients. As noted elsewhere, almost half of Via Christi's patients are Medicare patients, who frequently require more intensive hospital services or require them for a longer period. The incremental cost of treating private-pay patients, such as the Raytheon members, is up to 18% less than that of all patients in general.

237. Defendant's expert Dr. Phillip May credibly testified that, once certain corrections are made to plaintiff's calculations, PHS will cover its variable costs even when using Professor Feldman's definitions of fixed costs.

238. Coventry Health Care has also claimed that the DRG-based schedule to the City of Wichita forms the basis for Via Christi Regional Medical Center's alleged predatory price.

239. Coventry Health Care's CFO, Dale Wolfe, testified that a price for services between a parent company and its wholly-owned subsidiary is merely a "transfer price" that, on average, covers the parent corporation's expenses.

240. Mr. Michael Payne, the Risk Manager for the City of Wichita, testified that, in fact, PHS was making a profit on the City contract. He further testified that PHS anticipated making 2.5% profit on this business.

## M. Alleged Injury to Market Standing

241. CHC–KS has argued that its loss of the Raytheon account, with its approximately 25,000 covered lives, has destroyed an "anchor" business relationship, which will force it to exit the Wichita market.

242. CHC–KS does not confine its operations to Wichita. It operates in both Kansas and Missouri.

243. On January 18, 2001, CHC–KS acquired approximately 50,000 new members through its acquisition of the local plan of Kaiser Foundation Health Plan of Kansas City, Inc.

244. CHC–KS, like the other subsidiaries of CHC, regularly submits bids in response to RFPs (requests for proposals) from employers seeking competitive bids for their employee benefits.

245. CHC–KS was advised that it had lost the Raytheon bid on August 2, 2001. Despite knowing that it had lost this business, CHC–KS bid for the renewal of the Cessna contract to provide health care benefits to Cessna's employees starting in 2002.

246. Health care insurers normally obtain access to a provider network by directly contracting with the health care providers who form the network. However, an alternative which is sometimes used by insurers is renting the network created by another provider. Network rental is one means by which an insurer can quickly enter a local market.

247. Health insurers that "rent a network" of providers frequently compete against Blue Cross for managed care contracts and in fact have been successful bidders against Blue Cross.

248. An HMO may incur additional expenses in enlarging its presence in a given market. But these expenses are not in themselves a barrier to entry by existing, licensed HMO providers.

249. CHC–KS will remain in the Wichita market to service existing customers.

250. CHC–KS continues to bid on new business.

251. The Wichita market will remain profitable for CHC–KS—and this is not despite, but because of the absence of the Raytheon contract. In 2001, CHC–KS will lose approximately $4 million on the Raytheon account. Yet, during the same time,

the Wichita "profit and loss center" as a whole has been roughly break even.

### N. "Minimum Viable Scale"

252. In its complaint, CHC–KS alleges that it has been deprived of the ability to and opportunity of continued business relations with Raytheon. CHC–KS has subsequently asserted the existence of a "Minimum Viable Scale" required for profitable HMO enterprises, and that HMOs with membership under 35,000 to 40,000 are too weak to effectively compete.

253. CHC–KS's contentions of a minium viable scale are not credible.

254. CHC sold a health plan in Illinois with 56,000 risk members in 1998.

255. CHC sold its health plans in Florida, which totaled approximately 150,000 members.

256. CHC retained a health plan in Georgia, which for the years 1998 and 1999 had approximately 27,000 members.

257. CHC has a health plan in Nebraska with less than 35,000 members.

258. Information presented in the case demonstrates the continued presence of, and indeed entry into, various Kansas markets of HMOs with membership populations far less than the "Minimum Viable Scale" asserted by CHC–KS.

259. Also subsequent to losing the Raytheon bid, Mr. Finuf sent an email to his staff in which he discussed whether CHC–KS would continue to operate in Wichita:

Is there life for us without Raytheon? Absolutely. We have over the past year been working to re-focus our sales efforts in the small to medium sized businesses. This will enable us to have much less dependence on any one group and allow for better pricing flexibility. This approach has been very successful at many of our other plans. There would be some adjustments to be sure, but this company is committed to Wichita and Kansas.

### O. Other Alleged Anticompetitive Conduct

260. In its complaint, CHC–KS has complained about the fact that PHS has some contracts with physicians that are exclusive.

261. CHC has employed exclusivity arrangements in its business in a variety of circumstances.

262. For example, CHC negotiated an exclusive marketing arrangement with Aetna when it purchased the exclusive right to market to Aetna HMO members at the time of their renewal in St. Louis.

263. Also, while CHC has some "sliced business," where it has one of two or more health plans an employer offers to its employees, it prefers "total replacement" where it is the exclusive health plan offered to employees.

264. CHC began as a staff model HMO. In the staff model, physicians are employed by the HMO.

265. When Mr. Wise first joined CHC, the company still employed physicians in eight to ten locations.

266. Mr. Wise recognized that employing physicians is a form of exclusivity because the employed physicians cannot work for any competitor.

267. CHC also has chosen to contract exclusively with Wesley Hospital.

### P. CHC's Contract Rights

268. CHC reported in its 10K that at the end of the fourth quarter of 2000, it "closed its subsidiary, Coventry Health Care of Indiana, Inc."

269. CHC notified the Indiana Department of Insurance of its intention to close its subsidiary.

270. CHC reported that it took this action because the "Indiana health plan did not operate profitably or demonstrate good prospects for future growth."

271. When asked about an employer group that might have wanted to renew with CHC's Indiana plan, CHC CEO Wise explained that it was his understanding is that those were one year contracts, and any contract is renewable only with the agreement of both parties.

272. The contracts did not have an automatic renewal feature, so CHC exercised its right not to renew.

273. When asked to contrast this conduct with the CHC–KS claim that it was deprived of the ability to continue its business relation with Raytheon, Wise acknowledged that CHC–KS had no contractual right to renew:

> I don't know what the complaint says but I have the expectation that I should be able to compete and have an opportunity to renew the business. Certainly don't have any fight. Contract was what it was and it's a mutual decision.

## II. Conclusions of Law

▇ To obtain the requested injunctive relief, CHC–KS must show that it will suffer irreparable harm without the injunction, that the injury to it outweighs any potential damages to the defendants, that the injunction is not adverse to the public interest, and a substantial likelihood of prevailing on the merits. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096 (10th Cir.1991). Further, since plaintiff's requested relief would alter the status quo, and is mandatory rather than prohibitory in nature, plaintiff must demonstrate that on balance the factors relating to injunctive relief weigh heavily and compellingly in its favor. *See Lone Star Steakhouse & Saloon v. Adams*, 148 F.Supp.2d 1141 (D.Kan.2001).[2]

### A. Likelihood of Success on Its Claims.

The plaintiff CHC–KS's claim of attempted monopolization by predatory pricing requires proof of (1) a relevant geographic and product market; (2) specific intent of the defendants to monopolize the market; (3) anti-competitive conduct by the defendants in furtherance of this attempt; and (4) the dangerous probability that the defendants will succeed in this attempt. *Multistate Legal Studies v. Harcourt Brace Jovanovich Legal and Prof'l Publications*, 63 F.3d 1540, 1550 (10th Cir.1995). This court recently summarized some of the principles relating to claims of attempted monopolization by predatory pricing in *United States v. AMR*

---

**2.** The plaintiff must meet the heightened requirement because the "reality of the existing status and relationship between the parties" is the extant, freely negotiated, and shortly to be implemented contract between Raytheon and PHS, which has been incorporated by reference into the Raytheon workers' collective bargaining agreement. *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir.2001). This is not a case in which the party opposing injunctive relief has sought to unilaterally create a new status quo simply to create a heightened burden for the movant. To the contrary, the Raytheon–PHS contract was the result of months of independent negotiations between the parties. Subsequent to the adoption of the contract, the defendants, Raytheon, and thousands of Raytheon workers and members of their families have relied upon the contract for planning their health care services. These services will commence in less than two weeks. If the requirement to show an additional level of proof before altering the status quo is ever applicable, it is surely applicable here.

However, the issue is not controlling. CHC–KS has failed to demonstrate its entitlement to a preliminary injunction generally, even without the application of the heightened burden of showing that the factors relative to injunctive relief weigh heavily and compellingly in its favor.

*Corp.,* 140 F.Supp.2d 1141 (D.Kan.2001). The court noted:

> In *Brooke Group [Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)],* the Court clearly recognized the validity, in appropriate actions, of antitrust liability for predatory pricing. At the same time, however, and in light of the combined requirements of below-cost pricing and proof of recoupment, the Court noted "the general implausibility of predatory pricing" in the average case. *Brooke,* 509 U.S. at 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588–90, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In *Matsushita,* the Court stressed that "cutting prices in order to increase business often is the very essence of competition." 475 U.S. at 594, 106 S.Ct. 1348, 89 L.Ed.2d 538.
>
> Similarly, in *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 122, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) the Court warned that "mistaken inferences" concerning allegedly predatory prices "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *See also Northeastern Tel. Co. v. AT & T,* 651 F.2d 76, 88 (2d Cir.1981). The Supreme Court again expressed skepticism in *Brooke Group:*
>
> > These prerequisites to recovery [proof of below-cost pricing and recoupment] are not easy to establish, but they are not artificial obstacles to recovery; rather, they are essential components of real market injury. As we have said in the Sherman Act context, predatory pricing schemes are rarely tried, and even more rarely successful, and the costs of an erroneous finding of liability are high. The mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition. . . . It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high.
>
> 509 U.S. at 226, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (citations and internal quotations omitted).

140 F.Supp.2d at 1195 (footnotes omitted).

### 1. Antitrust Injury

■ Plaintiff must demonstrate standing to bring the present antitrust action, evidence both that the alleged conduct is "of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Thus, plaintiff must show both an "antitrust injury," and demonstrate a "direct causal connection between that injury and a defendant's violation of the antitrust laws." *Mellon v. Cessna Aircraft Company,* 7 F.Supp.2d 1183, 1190 (D.Kan.1998)

For proof of an antitrust injury, a claim under Section 2 of the Sherman Act requires proof of anticompetitive effect in the relevant market. *Rural Telephone Service Company, Inc. v. Feist Publications, Inc.,* 957 F.2d 765, 768 (10th Cir. 1992). Here, there is no question but that CHC–KS has lost a substantial customer account. However, reduction in the plaintiff's market share does not by itself demonstrate injury to competition. *Wichita Clinic v. Columbia/HCA Healthcare Corp.,* 45 F.Supp.2d 1164, 1193 (D.Kan.1999). In the present case, plaintiff has failed to demonstrate injury to competition, as opposed to injury to itself as a competitor.

The evidence establishes that employers in the Wichita area continue to be served by a variety of health insurers, including strong competitors such as Blue Cross,

Aetna, CIGNA, and American Medical Securities. Further, although CHC–KS has lost the Raytheon account, it remains a viable competitor in the Wichita market. It has continued to bid on new business in the area.

In addition, even assuming injury to plaintiff CHC–KS in failing to retain a contract on which it has consistently lost money and which it sought to retain on a zero profit basis, and further assuming anticompetitive conduct on the part of defendants, plaintiff is further not entitled to injunctive relief since it has failed to demonstrate that its injury is caused by the alleged anticompetitive conduct.

Here, it is uncontroverted that CHC–KS's bid failed to meet the specifications of Raytheon as to the length of the contract. In addition to CHC–KS and PHS, Raytheon, via its consultant, also actively solicited a bid from Blue Cross. Had Raytheon not accepted the PHS bid, other insurers might also have been invited to bid for the Raytheon account. The evidence before the court fails to establish a reasonable likelihood that, in the absence of the (supposedly illegal) PHS bid, CHC–KS would have retained the Raytheon account. *See Taylor Publishing Company v. Jostens, Inc.,* 216 F.3d 465, 484–85 (5th Cir.2000).

## 2. Specific Intent

■ A claim of attempted monopolization under Section 2 of the Sherman Act requires proof of a specific intent to monopolize. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich,* 63 F.3d 1540, 1550 (10th Cir. 1995). Having reviewed the evidence the court is unpersuaded that plaintiff will be able to demonstrate that defendants operated with an intent to illegally monopolize

the market for managed care services in the Wichita market.

Internal documents from the defendants, prepared prior to the present litigation and during the time of the negotiations for the Raytheon contract, fail to give any credible indication of a conscious design on the part of the defendants to price below cost as a part of some scheme to acquire monopoly power. Plaintiff has failed to demonstrate the existence of such design or intent on part of the defendants. To the contrary, those contemporaneous documents consistently indicate that the PHS bid price for the Raytheon contract would cover anticipated variable costs.

The court further finds credible the testimony of the defendant officers that there were no backdoor communications between Via Christi and PHS regarding the Raytheon contract. The court finds PHS was operated independently of Via Christi, according to its own business interest, by a Board of Directors composed primarily of physicians and community representatives with no direct ties to Via Christi and no interest helping to create a monopoly of managed care services in the Wichita area.

The court finds no credible evidence either direct, or by inference, of a specific intent to monopolize.

## 3. Market and Product Definition

■ A product market consists of "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The product market is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

The evidence submitted to the court relating to health insurance products establishes considerable substitution among consumers of health care services. According to the evidence, both employers and individual employees substitute among a variety of forms of insurance, including HMOs, PO's, PPOs, and indemnity products. This cross migration, according to Andrew Corbin of Blue Cross, is occurring "a great deal right now" in Wichita and throughout Kansas.

In contrast, evidence submitted by the plaintiff fails to credibly establish the existence of HMOs as a separate product market. Plaintiff's expert witness conceded that purchaser expectations could be established by independent surveys; none were attempted. Instead, plaintiff's theory of a separate HMO product is grounded only on a study of the effect on HMO prices in light of new HMO entrants in selected geographic areas. As noted earlier, the plaintiff's approach is unpersuasive since it fails, or rather does not even attempt to determine the existence of any impact on PPO prices in these same areas.

The court is therefore left with an absence of credible expert evidence relating to the existence of a separate HMO product market. In contrast, there is consistent evidence of considerable willingness of health insurance payors and consumers to consider a wide variety of insurance forms. Further, the internal documents of plaintiff and its parent CHC demonstrate that both considered other forms of health insurance, including PPOs and administrators of self-finance plan options, to be competitors with its market offerings.

Two decisions have addressed the question of whether HMO insurance may constitute a separate product market for antitrust purposes: *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406 (7th Cir.1995), *cert. denied,* 516 U.S. 1184, 116 S.Ct. 1288, 134 L.Ed.2d 233 (1996); and *U.S. Healthcare v. Healthsource,* 986 F.2d 589 (1st Cir.1993).

In *U.S. Healthcare,* the First Circuit was presented with the issue of whether HMO services are a separate health care product. The court noted that although there was evidence HMOs are sometimes cheaper than other forms of insurance, it concluded that "differences in cost and quality between products create the possibility of separate markets, not the certainty. A car with more features and a higher price is, within some range, in the same market as one with less features and a lower price." 986 F.2d at 598–99. The court found that plaintiff failed to provide coherent evidence of a separate HMO product.

In *Marshfield Clinic,* the court reversed a finding that defendant had monopolized the market for HMO services in a part of north central Wisconsin.

Compcare persuaded the jury that HMOs constitute a separate market, much as banks are a separate market from currency exchanges; and if there is a reasonable basis for this finding in the evidence, we are bound to accept it regardless of what we might think as an original matter. But we have searched the record in vain for evidence that under contemporary principles of antitrust law would justify such a finding. An HMO is not a distinctive organizational form or assemblage of skills, as is plain from the fact that the physicians retained by Security, whether they are employees of the Marshfield Clinic or completely independent, to serve its subscribers serve other patients on a fee for-service basis. An HMO is basically a method of pricing medical services. Instead of having the patient pay separately for each medical procedure, the patient pays a fixed annual fee for all the services he needs and the HMO

undertakes to provide those services with the physicians with whom it has contracts.

65 F.3d at 1409.

Reviewing the evidentiary record, the court found that it

shows, what is anyway well known, that individuals, and their employers, and medical insurers (the real "buyers" of medical services, according to the plaintiffs) regard HMOs as competitive not only with each other but also with the various types of fee-for-service provider, including "preferred provider" plans (generally referred to as "PPOs," for "preferred provider organization") under which the insurer offers more generous reimbursement if the insured patronizes physicians who have contracts with the insurer to provide service at low cost to its insureds.

. . . . .

[PPOs] are particularly close substitutes for HMOs, since they use the insurer's clout with physicians to drive down price. And if, as the record shows, they are feasible even in areas supposedly dominated by the Marshfield Clinic, and even without including any physicians employed by the Clinic, it is impossible to understand what barrier there could be to the formation of HMOs. All that is needed is an array of physicians who among them provide a broad range of medical services, and the same thing is needed for a preferred provider plan. Ability to create a preferred-provider plan therefore implies ability to create an HMO, and so implies in turn that if Security raised its prices above competitive levels, and if people had a strong preference for HMOs over preferred-provider plans despite the similarities between the two systems for providing medical care, the operators of those plans would convert them to HMOs. If

so, those plans are part of the same market with HMOs.

*Id.* at 1410.

Further, the court found that even if buyers might consider HMOs to be distinct from other insurance products such as PPOs, this by itself would not establish HMO services as a separate product for antitrust proposes if the insurers offering other products could respond to monopolistic pricing by also offering HMO services.

Even if two products are completely different from the consumer's standpoint, if they are made by the same producers an increase in the price of one that is not cost-justified will induce producers to shift production from the other product to this one in order to increase their profits by selling at a supracompetitive price. The services offered by HMOs and by various fee-for-service plans are both provided by the same physicians, who can easily shift from one type of service to another if a change in relative prices makes one type more lucrative than others.

*Id.* at 1411 (citations omitted).

CHC–KS notes that *Marshfield* and *U.S. Healthcare* do not hold that HMOs can *never* be found to be a separate market; only that in those cases the evidence was not sufficient to establish the existence of a separate product market. The court agrees, and does not hold here that HMOs can under no circumstances be deemed to be a discrete product. Rather, it holds, consistent with those cases, that the evidence produced herein falls far short of demonstrating the existence of viable product market for antitrust purposes.

As noted at the conclusion of the hearing on plaintiff's motion for an injunction, the court believes that plaintiff has demonstrated a geographic market for managed

care services in an area composed of Sedgwick and adjacent counties. However, given plaintiff's failure to demonstrate a product market to match the proposed geographic market, the court need not further explore or delineate the nature of the appropriate geographic market.

### 4. Below Cost Pricing

■ Plaintiff CHC has failed to demonstrate an essential element of likely success on the merits, failing to demonstrate that the defendants' product was priced below an appropriate measure of cost. Below cost pricing is an essential element of a Section 2 predatory pricing claim. *Brooke Group*, 509 U.S. at 222, 113 S.Ct. 2578 (plaintiff must show "that the prices complained of are below an appropriate measure of its rival's costs").

This court has previously expressed approval for use of average variable cost as a means of identifying potentially predatory conduct. *United States v. AMR Corp.*, 140 F.Supp.2d 1141, 1199 (D.Kan.2001). This is because sales above average variable costs help to cover a firm's fixed costs. Sales at such prices are therefore considered rational competitive behavior, in that they help contribute to cash flow of the company. *Pacific Eng'g & Prod. Co. of Nevada v. Kerr–McGee Corp.*, 551 F.2d 790, 797 (10th Cir.1977).

As stated earlier, the court has found that contemporaneous records from Via Christi and PHS demonstrate that defendants believed they were pricing above their average variable costs. Via Christi's internal accounting system represents a standard, computerized system of accounting which is used on a wide scale throughout the healthcare industry. Contemporaneous estimates based on that system consistently indicated that in the Raytheon bidding defendants were pricing above variable costs.

Plaintiff's alternative measure of variable costs is wholly unconvincing. Generally, approximately 30% of a hospital's costs are viewed as variable. Under plaintiff's recommended approach, however, 90% of Via Christi's costs would be deemed as variable. This approach would treat *all* of Via Christi's management and labor costs as fully variable. This approach, for which the court can find no precedent, is in fact contrary to all reported approaches.

Of course, as a general matter, there is no clear division between fixed and variable costs:

> Which costs are to be considered variable and which fixed is a function of the time period and how large a range of output is being considered. All costs are variable in the long run; almost no costs are variable in the short run of the next few hours. A predatory pricing rule that depends on the relationship between price and variable cost should focus on the costs that are variable in some relevant time period.

3 Areeda & Hovenkamp, *Antitrust Law,* ¶ 740dl at 386–87 (Rev. ed.1996).

The authority otherwise followed closely by plaintiff's expert explicitly suggests that plaintiff's approach, including for example all management costs as fully variable, is too broad. This authority notes that fixed costs, in contrast to variable costs, are "those that do not vary with changes in output. They typically include some management expenses, interest on bonded debt, depreciation (to the extent that equipment is not consumed by using it), property taxes, and other irreducible overhead." 3 Areeda & Hovenkamp, *Antitrust Law,* ¶ 753b3, at 320. Reported decisions focusing on fixed costs use the same definition. *See Stearns Airport Equipment v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999) (fixed costs include "salaried labor costs"); *AD/SAT v. Associated Press*, 920

F.Supp. 1287, 1301 (S.D.N.Y.1996) (certain management expenses considered fixed).

Plaintiff's approach represents an unjustified departure from the prevailing approach to fixed costs. It offers no credible justification for excluding management and other forms of irreducible overhead from the definition of fixed costs.

Moreover, the approach is also fundamentally flawed because it is based on a measure of Via Christi's total existing patient base. This approach therefore fails to accurately measure the true incremental costs of insuring the Raytheon employees and their dependents. The evidence before the court establishes that hospital patients represented by private payors are substantially less expensive than those who are protected by Medicare. The failure to account for this difference improperly inflates the true costs attributable to the increased production, here, the costs of serving the Raytheon members.

Finally, the court finds credible and persuasive the testimony of defendants' expert Phillip May, who testified that, if certain corrections are made to plaintiff's calculations, the PHS bid to Raytheon was not below cost even using the Feldman restrictive definition of fixed costs.

## 5. Dangerous Likelihood of Success

■ Finally, plaintiff has failed to provide evidence that, assuming defendants have engaged in anticompetitive conduct by predatory pricing, there is any dangerous likelihood the defendants will be able to recoup their losses. The evidence establishes that the market for health insurance was, and remains, very competitive. As a result, even assuming that defendants had engaged in below cost, predatory pricing, plaintiff has failed to demonstrate that they will be able to recoup their losses after they (allegedly) achieve monopoly power.

Evidence of market conditions contributing to the ability to recoup losses is essential, even though providing such evidence is "not easy." *Brooke Group*, 509 U.S. at 226, 113 S.Ct. 2578.

Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market. If market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed. In certain situations— for example, where the market is highly diffuse and competitive, or where new entry is easy, or the defendant lacks adequate excess capacity to absorb the market shares of his rivals and cannot quickly create or purchase new capacity—summary disposition of the case is appropriate.

*Id.* (citations omitted).

Here, plaintiff has failed to demonstrate the existence of any barriers to entry by additional competitors. As noted elsewhere, the court rejects plaintiff's suggestion that an HMO cannot remain a viable market competitor in the Wichita area unless it retains some supposed minimum market presence of 35,000 covered lives or more. The evidence establishes that an insurer offering an HMO product can remain in the market with much smaller membership.

CHC–KS will remain a viable competitor in the Wichita market, if it chooses. Other insurers, particularly Blue Cross, with significant resources are also present in the same market. There is no evidence of any structural barriers which would eliminate competition to PHS in the supposed postpredation period. To the contrary, barri-

ers to new entry into the health insurance market are "extremely low." *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance Inc.*, 784 F.2d 1325, 1332 (7th Cir.1986).

Even assuming CHC–KS and other insurers were to depart the market (which has not been shown to be likely), there is no credible evidence that this departure is irreversible. Rather, the evidence establishes that, while a managed care insurer might incur some expenses in entering a new local market, the entry nonetheless can be done quickly (if provisionally) by means of renting existing provider networks. "The insurance industry is not like the steel industry, in which a firm must take years to build a costly plant before having anything to sell. The 'productive asset' of the insurance business is money, which may be supplied on a moment's notice." *Ball Memorial*, 784 F.2d at 1335. Further, there is no evidence that large employers could not effectively respond to supposed supracompetitive pricing by employing self-insurance programs.

**B. Irreparable Harm**

■ Plaintiff CHC–KS has failed to provide credible evidence of irreparable injury if injunctive relief is denied. CHC–KS retains the ability to offer its licensed HMO product in Kansas. CHC–KS will remain in the Wichita area to service existing contracts. It has bid on new contracts after losing the Raytheon bid, and will continue to do so. The most credible evidence before the court—contemporaneous internal company memoranda—establishes that CHC–KS continues to consider itself a viable competitor. As noted earlier, the court finds that plaintiff's arguments relating to a "Minimum Viable Scale" are not credible. Although CHC–KS certainly has lost a relatively large account in losing the Raytheon account, it has also recently increased its market presence elsewhere in the state, and there has been no explana-

tion why employees and resources supposedly imperiled by loss of the Raytheon account cannot be retained to service this additional business.

**C. Balance of Interests**

As the court noted at the conclusion of the hearing, the court finds that the burden to CHC–KS, if the injunction is not granted, is roughly comparable to the burden imposed on defendant PHS if the injunction is granted. In either case, one of the two parties will lose the benefits of contracting with Raytheon Aircraft Company.

**D. Public Interest**

■ Finally, the court finds that the public interest weighs against the granting of injunctive relief. First, granting the relief sought would require reopening Raytheon's collective bargaining agreement, and removing the benefits of the negotiated savings obtained by Raytheon and its employees through the PHS contract. Further, an award of injunctive relief would undermine the competitive bidding process and run counter to the Supreme Court's directive in *Brooke Group* that the doctrine of predatory pricing must be applied with care, to avoid undermining the very goals of the antitrust laws.

**E. Additional Issues**

■ Several additional matters are before the court. Immediately before the commencement of the hearing on the present matter, the court granted defendants' motion to dismiss Count V, relating to tortious interference with contractual relations and tortious interference with contract. No allegation of a breach of the current Raytheon contract has been alleged, and CHC–KS agrees that no claim for tortious interference with contract is advanced here. With respect to tortious

interference with prospective contractual relations, the court is persuaded that, pursuant to *Pizza Management, Inc. v. Pizza Hut, Inc.*, No. 86–1664–C, 1989 WL 46253 (D.Kan. April 14, 1989), plaintiff has failed to present a triable claim.[3]

■ The defendants have also separately moved to dismiss allegations in the complaint that Via Christi Health System, Inc. and Via Christi Regional Medical Center, Inc., have abused their status as not-for-profit entities under 501(c)(3) of the Internal Revenue Code. The court will grant the defendants' motion. No evidence was presented during the hearing on plaintiff's motion for preliminary injunction that abuse of Via Christi's non-for-profit status played any significant role in the alleged predatory pricing scheme.

Morever, plaintiff CHC–KS has no standing to assert, in the context of the present antitrust action, complaints relating to the validity of Via Christi's tax-exempt status. *See Nilavar v. Mercy Health System–Western Ohio*, 142 F.Supp.2d 859 (S.D.Ohio 2000). In *Nilavar*, the court held that a radiologist who otherwise had standing to bring antitrust claim against a defendant hospital was without standing to raise claims about alleged violations of the hospital's 501(c)(3) status. The court found no basis for viewing plaintiff's injury (exclusion from the hospital's radiology facility) was traceable to the hospital's tax-exempt status, and that revocation of the tax-exempt status would not redress plaintiff's injury. 142 F.Supp.2d at 889.

A plaintiff challenging the tax-exempt status of a defendant must show a personal injury, which is "fairly traceable" to the abuse of the tax-exempt status of the defendant and which is "likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Here, plaintiff's requested relief does not include revocation of Via Christi's tax exempt status, and its injuries—loss of the Raytheon account due to supposed predatory pricing—does not flow from the alleged abuse of Via Christi's tax-exempt status.

The defendants' motion also argues that Via Christi in fact has not abused its tax exempt status. While the argument is not unpersuasive, the court need not and should not decide the question. Having determined that plaintiff is without standing to assert the matter here, the court finds that the question is not properly before the court and will not resolve the question.

Finally, the court will grant the motion to dismiss Via Christi Health System as a party defendant. No allegations directly tied to this entity have been advanced, and the court finds that dismissal is appropriate.

## F. Summary

The plaintiff has failed to present evidence showing an award of injunctive relief is necessary to protect it from an irreparable injury. Further, the court finds issuing a preliminary injunction would be adverse to the public interest. Finally, plaintiff has failed to demonstrate

---

**3.** Alternatively, even if the court were to assume plaintiff's claims of tortious interference were actionable, no basis for the requested relief would exist under the facts presented to the court. The evidence provided to the court establishes first, that defendants' acquisition of the Raytheon business was not tortious, but a lawful and justifiable business decision taking the form of a better bid for the Raytheon account, and second, that plaintiff has failed to demonstrate that, in light of its own non-compliant bid and additional competition from Blue Cross, it had any reasonable expectation of actually retaining the Raytheon business.

a reasonable likelihood of prevailing on the merits of its claim. The evidence does not establish that the PHS bid was based upon pricing below an appropriate measure of cost. Rather, the evidence suggests strongly that the PHS bid simply reflects PHS's lower level of physician costs, the reasonable expectation of added efficiencies from Via Christi's adoption of DRG-based reimbursement, CHC-KS's higher administrative costs, and CHC's concern for pricing discipline and its ability to project favorable reports to investors.

The evidence does not establish a market in which Via Christi or PHS threaten to acquire the ability to impose supracompetitive pricing. Rather, the evidence suggests strongly that the market for managed care services in the Wichita area is very competitive. Any attempt to impose monopoly pricing would be met rapidly by a variety of responses which would effectively frustrate the scheme. These responses include market entrance by new HMO's (possibly by provider network rental), competition by existing competitors, or shifting of employers and employees to PPO or self-administered insurance plans.

Given the credible evidence submitted to the court, plaintiff has failed to demonstrate that preliminary injunctive relief is justified.

IT IS ACCORDINGLY ORDERED this _____ day of December, 2001, that the plaintiff's Motion for a Preliminary Injunction is denied. Defendants' Motions to Dismiss (Dkt. Nos. 98 and 123) are hereby granted.